**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **KYNNEDI'RAE JOAN CHARLES,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:21-cv-153 (MTT)** |
| | ) | |
| **GARY WAYNE CHAMBERS, *et al.*,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>ORDER</u>

Pro se Plaintiff Kynnedi'rae Joan Charles raises a variety of constitutional and state law claims arising from her interaction with the Warner Robins Police Department ("WRPD") while her car was being towed from the storefront parking lot of a nail salon. Doc. 29. Specifically, Charles claims Defendants Robert Greene and Christopher Richard Scuderi, both officers with the WRPD, violated her Fourth Amendment right to be free from unlawful arrest and excessive force, and committed the torts of assault, battery, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress when they removed Charles from her vehicle. *Id.* ¶¶ 52-65, 77-97. Charles also contends the City of Warner Robins and John Wagner, Jr., the Chief of the WRPD, are liable under a theory of supervisory liability and for their failure to train Greene and Scuderi. *Id.* ¶¶ 66-76. Defendants Greene, Scuderi, Wagner, and the City now move for summary judgment. Doc. 57. For the reasons that follow, the defendants' motion (Doc. 57) is **GRANTED**.

# I. BACKGROUND[1]

Greene, an Officer with the WRPD, responded to a property dispute at a shopping center in Warner Robins, Georgia, on November 7, 2020.  Doc. 57-1 ¶ 1.  Upon arrival, Greene observed a tow truck hooked to a white Mercedes sedan, about five feet from the storefront of USA Nails.  *Id.* ¶¶ 1-2.  Greene spoke to the tow truck driver, who informed Greene that as he was attempting to repossess the Mercedes, a woman, later identified as Charles, ran from USA Nails and jumped into the vehicle.  *Id.* ¶ 2.  The tow truck driver showed Greene cell phone video, taken prior to Greene's arrival, of "the Mercedes' tires turning at a high rate of speed and the vehicle bouncing while attached to the tow truck."  Doc. 57-1 ¶ 3; Greene Bodycam 18:16:06-18:17:02.

Greene called for backup, and Officer Scuderi responded.  Doc. 57-1 ¶ 4.  Scuderi parked his patrol vehicle so that it faced the tow truck, and the Mercedes to

---

[1] Unless otherwise stated, all facts are undisputed.  Cognizant of Charles's pro se status, following the defendants' motion for summary judgment, the Court advised Charles of her duty to respond to the motion for summary judgment, including the admonitions that she could not rely on the pleadings but instead must present evidence to establish a genuine issue of material fact and must provide her own statement of material facts and respond to the defendants' statement of facts.  Doc. 58.  Despite this notice, Charles's response failed to meet these requirements.  *See* Docs. 60-1; 60-5.  Charles did not respond to the defendants' asserted facts with citations to the record, and she failed to provide her own statement of material facts that adequately cited to the record.  Docs. 60-1; 60-5.  Rather, most of Charles's facts re-stated conclusory arguments from her complaint.  Docs. 60-1; 60-5.  And by and large, Charles has presented no evidence, outside of her own threadbare affidavits, to support her claims.  *See* Docs. 60-6; 62.  Thus, Charles has "fail[ed] to properly support an assertion of fact [and] fail[ed] to properly address [the defendants'] assertion of fact as required by [Fed. R. Civ. P.] 56(c)," and, accordingly, "the court may … consider [those] fact[s] undisputed for purposes of the motion" pursuant to Rule 56(e)(2).  Moreover, pursuant to Local Rule 56, those material facts asserted by the defendants, "which [Charles has] not specifically controverted by specific citation to particular parts of materials in the record," are deemed to be admitted.  M.D. Ga. L.R. 56 ("All material facts contained in the movant's statement [of material facts] which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate.").  However, the Court has still "review[ed] the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact."  *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008) (quotation marks omitted).  And despite the deficiencies in Charles's response, because Charles is proceeding pro se, and because summary judgment would lead to dismissal of her claims with prejudice, the Court has fully analyzed Charles's claims for relief regardless of these failings and insufficiencies in her response.  *United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  Therefore, if evidence in the record shows that a fact is disputed, the Court draws all justifiable inferences in Charles's favor for purposes of summary judgment.

which it was attached.  Scuderi Dashcam 18:24:08.  Greene briefed Scuderi on the situation, then once again spoke to the tow truck driver who confirmed that Charles was not inside the vehicle when he hooked up the tow truck, and that "[a]s soon as [he] lifted it up, she climbed in."  Doc. 57-1 ¶ 5.  Greene then spoke to three witnesses at the Sports Clips adjacent to USA Nails, who all confirmed that the Mercedes was already hooked to the tow truck when Charles ran out of USA Nails and jumped in the vehicle. *Id*. ¶ 6.  Meanwhile, Scuderi contacted a supervisor to discuss the situation and determine the appropriate response.  *Id*. ¶ 7.

Charles remained seated in the driver's seat of the Mercedes with the vehicle off as Greene and Scuderi investigated.  Greene Bodycam 18:16:07-18:31:00.  As Greene finished speaking to the witnesses, Scuderi approached the driver's side of the Mercedes and instructed Charles to exit the vehicle.  Doc. 57-1 ¶ 8.  Charles refused. *Id.*  Greene then approached, stood behind Scuderi next to the driver's side passenger door, and also told Charles to exit the vehicle.  Doc. 57-1 ¶¶ 8-9; Greene Bodycam 18:30:18-18:30:31.  Once again, Charles refused.  Doc. 57-1 ¶ 9.

This exchange continued for several minutes, with Scuderi ultimately warning Charles that if she refused to exit, they would break the window and remove her from the vehicle.  *Id.*  In response, Charles turned on the ignition and locked the doors.  *Id.* (citing Greene Bodycam 18:30:57).  Although it is unclear from Greene's bodycam footage, both Greene and Scuderi, through sworn affidavits, stated Charles then moved her hand to the vehicle's gear shifter.  Docs. 57-5 ¶¶ 8-9; 57-6 ¶¶ 8-9.  In any event, what happened next is clear.  Greene deployed his baton and broke the rear driver's side window, and immediately reached through the broken window to unlock the front

driver's side door.  Doc. 57-1 ¶¶ 10-11; Greene Bodycam 18:31:20.  Charles then

placed the vehicle in drive and floored the accelerator.  Doc. 57-1 ¶ 10; Scuderi

Dashcam 18:31:08.  The vehicle, still attached to the tow truck with its rear wheels

elevated, bounced as it strained against the tow trucks rigging.  Doc. 57-1 ¶ 10; Scuderi

Dashcam 18:31:08-18:31:21.  Scuderi then opened the unlocked front driver's door and

reached into the vehicle to place it in park.  Doc. 57-1 ¶ 11; Greene Bodycam 18:31:23.

A struggle ensued as both Scuderi and Greene ordered Charles to exit the vehicle, with

both officers attempting to pull Charles out of the front driver's side door before Scuderi

moved to the front passenger's side door.  Doc. 57 ¶ 11; Scuderi Dashcam 18:31:25-

18:31:40.

Once at the front passenger's side door, Scuderi told Charles that if she

continued to resist, she would be tased.  Doc. 57-1 ¶ 12.  Charles refused to comply,

and "Scuderi drew his taser and 'sparked' it to encourage compliance."  *Id.*  Scuderi

maintains he did not tase Charles, although Charles, through her own affidavits, says

that he did, or at least that "the wireless taser spark jumped onto [her] arm causing

muscle contractions."  Docs. 57-6 ¶ 11; 60-6 ¶ 7; 62 ¶ 7.  The videos, in this regard, are

of little help because both Scuderi's and Greene's bodycams[2] were knocked off during

the struggle and Scuderi's dashcam could not capture what was happening inside the

vehicle.[3]  Greene Bodycam 18:31:34-18:35:54; Scuderi Dashcam 18:31:34-18:32:44.

---

[2] The defendants only put Greene's bodycam and Scuderi's dashcam footage into evidence, both of which were authenticated by Greene, Scuderi, and the WRPD's record custodian.  Docs. 57-7; 57-8; 57-9; 57-10.  Charles filed identical copies of Greene's bodycam and Scuderi's dashcam footage, and the unauthenticated bodycam footage of Jump, a WRPD officer who arrived on scene after Charles was removed from the vehicle.  Authentication issues aside, the Court need not consider Jump's bodycam footage because it is duplicative and lacks probative value.  Fed. R. Evid. 403.

[3] A taser "spark" is audible in Scuderi's dashcam footage from 18:32:31 to 18:32:34, directly after Scuderi told Charles he would tase her if she refused to comply.

Greene was eventually able to remove Charles from the vehicle, at which point Scuderi returned to the driver's side to assist.  Scuderi Dashcam 18:32:43; Doc. 57-1 ¶ 13.  Initially, Greene was only able to handcuff one of Charles's hands.  Doc. 57-1 ¶ 13. Both Scuderi and Greene repeatedly directed Charles to place both hands behind her back, but Charles continued to resist.  *Id.*  As the struggle outside the vehicle continued, Scuderi said "stop resisting or you are going to get tased, this is your last warning." Doc. 57-1 ¶ 14; Scuderi Dashcam 18:32:45-18:32:49.  Charles then lunged for Scuderi's taser.  Doc. 57-1 ¶ 14; Scuderi Dashcam 18:33:10.  Scuderi exclaimed "don't touch my taser," and then said, "if you touch my taser again, and it's going to get bad." Scuderi Dashcam 18:33:10-18:33:16.  Approximately three minutes after Greene first broke the window to remove Charles from the vehicle, Greene and Scuderi were able to gain control of Charles's remaining uncuffed hand and place both her wrists in handcuffs.  Scuderi Dashcam 18:31:20-18:33:59.

Officer Jump arrived immediately after Greene and Scuderi handcuffed Charles.[4] Doc. 57-1 ¶ 15; Scuderi Dashcam 18:33:45.  The three officers escorted Charles away from the vehicle, and Scuderi and Jump lowered Charles to the ground to a seated position.  Doc. 57-1 ¶ 15.  Because Charles said she was pregnant and complained of back pain and cuts to the bottoms of her feet from the broken window glass, the officers requested Emergency Medical Services ("EMS").  *Id.* ¶ 16.  EMS arrived on scene and transported Charles to Houston Medical Center for evaluation and treatment.  *Id.*  Once at Houston Medical Center, Charles's medical records show that she refused medical

---

[4] Although Charles continues to assert claims against John C. Jump, the Court dismissed those claims "[b]ecause Jump was never served, timely or otherwise."  Doc. 55 at 6.

treatment, including an ultrasound, and was released into police custody.[5]  Doc. 57-3 at 15-24.  On January 6, 2021, Charles went to the Houston Medical Center Emergency Department and complained of abdominal cramping.  *Id.* at 25-26.  She reported she was told by a third-party healthcare provider that her pregnancy was non-viable and that she would need a dilation and curettage procedure ("D&C").  *Id.* at 25-36.  As for Greene and Scuderi, an internal review by the WRPD concluded that the amount of force used "was reasonable and within the policies and procedures" of the department.  Doc. 57-1 ¶ 18.

Proceeding pro se, Charles filed her complaint on April 30, 2021.  Doc. 1.  After retaining counsel, Charles, with leave of Court, amended her complaint.  Docs. 24; 27.  Charles's counsel then moved to withdraw, which the Court granted.  Docs. 28; 30.  With discovery complete, the defendants have moved for summary judgment.[6]  Doc. 57.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir.

---

[5] Charles moves to strike the Houston Medical Center medical records because they "do not bear Plaintiff's correct date of birth and do not Appear to be Plaintiff's records."  Doc. 59 ¶ 2.  But as the defendants note, "[t]he records produced by Defendants were certified by the medical records custodian of Houston Medical Center and have been verified as a true and accurate copy of Plaintiff's records for the subject incident and subsequent treatment."  Doc. 64 at 1.  The record custodian also established the admissibility of the record.  The date of birth discrepancy—"04/17/1981" on the date of the subject incident, and "04/07/1981" in subsequent treatment records—is simply a typo.  Accordingly, Charles's motion to strike (Doc. 59) is **DENIED**.

[6] Through a letter to the Court, Charles asserts that the defendants' reply brief is untimely and should be struck.  Doc. 65.  Charles is incorrect, as the defendants note, because their reply brief was due on January 18, 2023, and the defendants filed their reply brief on that date.  Doc. 66.  To the extent Charles's letter can be construed as a motion to strike, that motion (Doc. 65) is **DENIED**.

2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings."  *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2).

However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge …. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

Charles contends Officer Greene and Officer Scuderi violated her Fourth Amendment right to be free from unlawful arrest and excessive force and committed a variety of state law torts.  Doc. 29 ¶¶ 52-65, 77-97.  Charles also contends the City of Warner Robins and Chief Wagner both are liable under a theory of supervisory liability and for their failure to train Greene and Scuderi.  *Id.* ¶¶ 66-76.  Greene and Scuderi argue they are entitled to qualified immunity on Charles's constitutional claims, official immunity on Charles's state law claims, and both the City and Wagner argue Charles has failed to present any evidence to support her supervisory liability and failure to train claims.  Doc. 57-2 at 8-18.

### A. Greene and Scuderi are Entitled to Qualified Immunity

Officers Greene and Scuderi argue they are entitled to qualified immunity on Charles's Fourth Amendment claims for unlawful arrest and excessive force.  Docs. 57-2 at 12-17; 63 at 4-8.  The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Although qualified immunity provides government officials with a formidable shield, their entitlement to raise that shield is not

automatic … the official bears the initial burden of raising the defense of qualified immunity by proving that he was acting within his authority." *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018). "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)). Here, Charles does not argue, nor could she, that Greene and Scuderi were acting outside the scope of their discretionary authority. *See Diamond v. Smith*, 2022 WL 4097333, at *3-4 (M.D. Ga. Sept. 7, 2022). Thus, Greene and Scuderi are entitled to raise the shield of qualified immunity.

To overcome a qualified immunity defense, Charles must establish that (1) the facts, viewed in her favor, establish a constitutional violation; and (2) the unconstitutionality of Greene and Scuderi's conduct was clearly established at the time alleged constitutional violations occurred. *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). This two-step analysis may be done in whatever order is deemed most appropriate for the case. *Lewis*, 561 F.3d at 1291 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "[W]hen a false arrest claim and a genuine excessive force claim arise out of the same incident, the false arrest and excessive force claims 'must be analyzed independently.'" *Richmond v. Badia*, 47 F.4th 1172, 1181 (11th Cir. 2022) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)). Here, the Court begins and ends with whether Greene and Scuderi's conduct was unconstitutional—it was not.

*1. Unlawful Arrest*

"Under the Fourth Amendment, an individual has a right to be free from unreasonable searches and seizures and an arrest is a seizure of the person." *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (quoting *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007)) (cleaned up). But while "[a] warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim, the existence of probable cause at the time of arrest ... constitutes an absolute bar" to any such claim. *Id.* at 1326-27 (quoting *Kingsland v. City. of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004). In other words, if Greene and Scuderi had probable cause, Charles's unlawful arrest claim must fail.

"Probable cause exists when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013) (quoting *Lee*, 284 F.3d at 1195). Put differently, "[p]robable cause requires more than mere suspicion, but does not require convincing proof." *Bailey v. Bd. of Cnty. Comm'rs*, 956 F.2d 1112, 1120 (11th Cir. 1992). "Simply stated, that standard requires that an arrest be objectively reasonable under the totality of the circumstances." *Id.* at 1119.

Here, Greene and Scuderi had probable cause to arrest Charles for two crimes. First, Greene and Scuderi had probable cause to arrest Charles for reckless conduct. Under O.C.G.A. § 16-5-60(b), reckless conduct occurs when:

> A person [] causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable

risk that his or her act or omission will cause harm or endanger the safety of the other person  and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation[.]

 "The crime of reckless conduct is, in essence, an instance of criminal negligence, rather than an intentional act, which causes bodily harm to or endangers the bodily safety of another."  *Riley v. State*, 250 Ga. App. 427, 429, 551 S.E.2d 833, 836 (2001).  Charles argues the repossession was unlawful, but Charles misses the point.[7]  Doc. 60-2 at 6-7.  When Greene arrived on scene, the tow truck driver showed him cell phone video of "the Mercedes' tires turning at a high rate of speed and the vehicle bouncing while attached to the tow truck."  Doc. 57-1 ¶ 3; Greene Bodycam 18:16:06-18:17:02.  Given the vehicles proximity to several businesses and the risk to life, limb, and property should the vehicle have broken free, probable cause existed for Greene to arrest whoever was driving the vehicle, which Greene's investigation revealed to be Charles.  Doc. 57-1 ¶¶ 5-6.  Clearly, Greene and Scuderi had probable cause to arrest Charles for reckless conduct in violation of O.C.G.A. § 16-5-60(b).

Greene and Scuderi also had probable cause to arrest Charles for obstruction of an officer.  Under O.C.G.A. § 16-10-24(b), obstruction of an officer, a felony, occurs when a person "knowingly and willfully resists, obstructs, or opposes any law enforcement officer … in the lawful discharge of his or her official duties by offering or doing violence to the person of such officer[.]"  Actual injury to the officer is not required.  *Phillips v. State*, 267 Ga. App. 733, 735, 601 S.E.2d 147, 150 (Ga. App. 2004).  Here,

---

[7] In an attempt to prove ownership of the vehicle, Charles introduces a title, issued on December 3, 2020, that shows the vehicle was purchased on November 30, 2020 by Diamond House GA, LLC, a domestic limited liability company of which Charles is the registered agent.  Doc. 60-11 at 4, 6.  But that title is irrelevant because the events that gave rise to this case transpired on November 7, 2020, over three weeks prior to the issuance of the clean title.

Charles refused to exit her vehicle when Greene and Scuderi repeatedly told her to do so.  Doc. 57-1 ¶¶ 8-9.  And then once Greene and Scuderi broke the window to remove Charles, Charles placed the vehicle in drive and floored the accelerator.  Doc. 57-1 ¶ 10; Scuderi Dashcam 18:31:08.  Even when the officers successfully removed Charles from the vehicle, Charles continued to struggle, and it took the efforts of both Greene and Scuderi to gain control of Charles and place both her wrists in handcuffs.  Scuderi Dashcam 18:31:20-18:33:59.  Greene sustained minor abrasions to his hand because of the incident.  Greene Bodycam 18:38:32-18:39:08; 18:46:07-18:46:11.  Greene and Scuderi had probable cause to arrest Charles for obstruction of an officer in violation of O.C.G.A. § 16-10-24(b).[8]

Because Greene and Scuderi had probable cause to arrest Charles for violations of O.C.G.A. § 16-5-60(b) and O.C.G.A. § 16-10-24(b), there was no constitutional violation and Greene and Scuderi are entitled to qualified immunity with regard to Charles's unlawful arrest claim.[9]

### 2. Excessive Force

"The Fourth Amendment protects against excessive force in the arrest context." *Charles v. Johnson*, 18 F.4th 686, 699 (11th Cir. 2021) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "An officer's use of force … violates the Fourth Amendment

---

[8] The defendants note Charles was charged with two counts of felony obstruction and one count of reckless conduct, and subsequently indicted by a Houston County grand jury on December 21, 2021. Doc. 57-1 ¶¶ 17, 19.  However, "a subsequent grand jury indictment does not retroactively provide probable cause for a false arrest that had already taken place."  *Jones v. Cannon*, 174 F.3d 1271, 1285 n.8 (11th Cir. 1999) (citing *Garmon v. Lumpkin Cnty., Ga.*, 878 F.2d 1406, 1408-09 n.2 (11th Cir. 1989)).

[9] Even if Greene and Scuderi lacked probable cause, they would still be entitled to qualified immunity because they at least had "arguable probable cause" to arrest Charles for violations of O.C.G.A. § 16-5-60(b) and O.C.G.A. § 16-10-24(b).  Arguable probable cause requires only that "under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present."  *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004).  In other words, even if Charles met her burden on the first prong of qualified immunity analysis, she would fail under the second "clearly established" prong.  *Waits v. Spencer*, 2023 WL 350392, at *3 (M.D. Ga. Jan. 20, 2023).

when it is *objectively unreasonable* under the facts and circumstances of a specific

case, 'judged from the perspective of a reasonable officer on the scene, rather than with

the 20/20 vision of hindsight.'"  *Stephens v. DeGiovanni*, 852 F.3d 1298, 1321 (11th Cir.

2017) (quoting *Graham*, 490 U.S. at 396).  But "[n]ot every push or shove, even if it may

later seem unnecessary in the peace of a judge's chambers, violates the Fourth

Amendment."  *Graham*, 490 U.S. at 396 (citation omitted).  During an arrest, "the

application of de minimis force, without more, will not support a claim for excessive

force in violation of the Fourth Amendment."  *Baxter v. Roberts*, 54 F.4th 1241, 1269

(11th Cir. 2022) (quoting *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000)).

Greene and Scuderi argue the force employed to remove Charles from her

vehicle—grabs, pushes, and pulls—was a mere application of de minimis force and for

that reason Charles's excessive force claim must fail.  Doc. 57-2 at 15-17.  The Court

agrees that the grabs, pushes, and pulls used to remove Charles from the vehicle and

restrain her did not rise to the level of excessive force.  *See, e.g.*, *Nolin*, 207 F.3d at

1255, 1258 (holding that the officer did not use excessive force when he "grabbed [the

plaintiff] from behind by the shoulder and wrist, threw him against a van three or four

feet away, kneed him in the back and pushed his head into the side of the van,

searched his groin area in an uncomfortable manner, and handcuffed him" resulting in

"bruising to his forehead, chest, and wrists."); *Rodriguez v. Farrell*, 280 F.3d 1341,

1345, 1351 (11th Cir. 2002) (holding that an officer did not use excessive force when he

"grabbed [plaintiff's] arm, twisted it around [plaintiff's] back, and forced it up to just below

the shoulder-blade" as the plaintiff "fell to the ground screaming in pain, telling [the

officer] that he was hurting his arm."); *Baxter*, 54 F.4th at 1269 (holding that plaintiff's

excessive force claim "warrants only brief consideration" where the officer "initiate[d] the arrest after [the plaintiff] verbally and then physically resisted his commands" and then grabbed the plaintiffs arm, forced him to the ground, twisted his arm and jerked it up before handcuffing the plaintiff, which resulted in "a chipped tooth and facial abrasions."). Here, Scuderi's dashcam footage clearly shows that once Charles was handcuffed, no additional force was used. Doc. 57-1 ¶ 15 (citing Scuderi Dashcam 18:34:22). And to the extent Charles received injuries that required medical attention, those injuries consisted of "back pain and cuts to the bottom of her feet from the broken window glass." Doc. 57-1 ¶ 16. In short, the grabs, pushes, and pulls employed by Greene and Scuderi to remove Charles from her vehicle constitute an application of de minimis force which cannot support an excessive force claim "without more." *Baxter*, 54 F.4th at 1269.

But there is something more to the force used by Scuderi that the defendants fail to address. Charles claims she was tased by Scuderi while inside the vehicle, and because the video evidence does not directly contradict Charles's version of events, the Court accepts that allegation as true for the purposes of summary judgment. *Richmond*, 47 F.4th at 1179 ("Although we must view the facts in favor of the nonmoving party, we accept video evidence over the nonmoving party's account when the former obviously contradicts the latter."). Scuderi does not argue the use of a taser was an application of de minimis force; he simply says it didn't happen. Doc. 57-2 at 16. But "[a]t summary judgment, [the Court] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was

excessive under those circumstances." *Fils v. City of Aventura*, 647 F.3d 1272, 1288

(11th Cir. 2011) (citation omitted). Accordingly, the Court addresses whether Scuderi's

use of a taser to remove Charles from her vehicle constitutes excessive force.

To determine whether an officer used excessive force, courts conduct a two-step

inquiry. *Charles*, F.4th 686 at 699. "First, [courts] ask whether the specific kind of force

is categorically unconstitutional. Second, if the kind of force is not categorically

unconstitutional, [courts] then ask … whether the amount of force was excessive." *Id.*

Relevant here, "[t]he use of a taser is not categorically unconstitutional [and] can be

appropriate in a wide array of situations." *Id.* at 701. Thus, the question is whether

Scuderi's use of a taser to remove Charles from her vehicle was objectively reasonable

under the circumstances. To answer this question, courts evaluate six factors:

> (1) the severity of the suspect's crime, (2) whether the suspect poses an
> immediate threat of harm to others, (3) whether the suspect is actively
> resisting arrest or trying to flee, (4) the need for the use of force, (5) the
> relationship between the need for force and the amount of force used, and
> (6) how much injury was inflicted.

*Wade v. Daniels*, 36 F.4th 1318, 1325 (11th Cir. 2022) (citation omitted).

As to the first factor, two crimes were at issue by the time Scuderi deployed the

taser—reckless conduct and obstruction. The information available to the officers

suggested that Charles had attempted to free her vehicle from the tow truck's rigging

before the officers arrived on scene. Specifically, based on witness statements and the

tow truck driver's cell phone video, which Greene reviewed and relayed to Scuderi, the

officers had probable cause to arrest Charles for that offense. But Charles refused to

exit her vehicle—which she had already demonstrated she was willing to use in a

dangerous manner—and instead again placed the vehicle in drive, at which point

Greene broke the window so the officers could remove her.  Doc. 57-1 ¶¶ 3, 10-11.

When Charles floored the accelerator and continued to actively resist the officers,

Greene and Scuderi also had probable cause to arrest Charles for felony obstruction.

*Phillips*, 267 Ga. App. at 735, 601 S.E.2d at 150.  This factor weighs in favor of Scuderi.

The second factor examines whether the plaintiff "pose[d] an immediate threat to

the safety of the officers or others."  *Graham*, 490 U.S. at 396.  Here, Charles posed an

immediate threat to Scuderi, Greene and the occupants of USA Nails.  Doc. 57-6 ¶ 9.

Immediately before Scuderi deployed his taser, Charles floored the accelerator causing

the vehicle, still attached to the tow truck, to bounce as it strained against the tow trucks

rigging.  Doc. 57-1 ¶ 10; Scuderi Dashcam 18:31:08-18:31:21.  While Scuderi was able

to place the vehicle in park, Charles had twice shown she was able and willing to

attempt to break free of the tow truck.  Doc. 57-1 ¶¶ 3, 10.  And as Scuderi made clear

in his affidavit, he "was afraid that the vehicle could become detached from tow truck

and would go forward into the nail salon, where it would damage the store front and

potentially injure the salon's employees and customers."  Doc. 57-6 ¶ 9.  The second

factor also weighs in favor of Scuderi.

The third factor weighs in Scuderi's favor because Charles was still actively

resisting when Scuderi allegedly deployed his taser inside the vehicle.  *See Graham*,

490 U.S. at 396.  After Scuderi placed the vehicle in park, Scuderi moved to the front

passenger's side door while Greene attempted to remove Charles through the driver's

side door.  Doc. 57-1 ¶ 11; Scuderi Dashcam 18:31:25-18:31:40.  Once at the front

passenger's side door, Scuderi told Charles that if she continued to resist, she would be

tased.  Doc. 57-1 ¶ 12.  Charles continued, and according to Charles's version of

events, she was tased.  Docs. 60-6 ¶ 7; 62 ¶ 7.  Even then, Charles continued to resist as Scuderi and Greene removed her from the vehicle.  Doc. 57-1 ¶ 13; Scuderi Dashcam 18:32:46.  Once removed from the vehicle, Charles continued to resist and even lunged for Scuderi's taser.  Doc. 57-1 ¶ 14; Scuderi Dashcam 18:33:10.  In short, if Scuderi tased Charles, he did so while Charles was actively resisting arrest.

The fourth factor—the officer's need for the use of force—turns on whether "a reasonable officer on the scene could have believed [the plaintiff] posed a danger to himself or others and was actively resisting arrest."  *See Wade*, 36 F.4th at 1325; *Smith v. LePage*, 834 F.3d 1285, 1295 (11th Cir. 2016).  In *Draper v. Reynolds*, the Eleventh Circuit held that it was permissible to tase an unarmed truck driver who was outside his truck because he was belligerent and noncompliant during a traffic stop.  369 F.3d 1270, 1278 (11th Cir. 2004).  Here, Scuderi faced a potentially far more dangerous situation than officers faced in *Draper*.  When Charles claims she was tased, she was still in the driver's seat of her vehicle and thus in a position to once again attempt to free her vehicle from the tow truck which would have placed the officers and others at risk.  Docs. 60-6 ¶ 7; 62 ¶ 7; Scuderi Dashcam 18:32:31-18:32:34.  Put another way, Charles possessed a potentially dangerous weapon.  *See Draper*, 369 F.3d at 1273; *United States v. Gualdado*, 794 F.2d 1533, 1535 (11th Cir. 1986) ("An automobile has been held to constitute a deadly weapon when used to run down a law enforcement officer."); *see also United States v. Gumbs*, 964 F.3d 1340, 1350-51 (11th Cir. 2020) (holding that the evidence was sufficient to support defendant's conviction of using a deadly weapon, his car, to forcibly assault, resist, oppose, impede, intimidate, or interfere with federal officers.").  The fourth factor favors Scuderi.

The fifth factor analyzes the relationship between the need for force and the amount of force used and turns on proportionality, which is "preeminent in the excessive-force context." *See Wade*, 36 F.4th at 1325; *Patel v. City of Madison, Alabama*, 959 F.3d 1330, 1340 (11th Cir. 2020). Here, a taser "spark" is audible on Scuderi's dashcam footage for four seconds during the period in which Charles claims she was tased. Scuderi Dashcam 18:32:31-18:32:34. Such a brief use of force, if it in fact occurred, was proportional. *See Oliver v. Fiorino*, 586 F.3d 898, 905-07 (11th Cir. 2009). For example, in *Oliver*, the Eleventh Circuit held that "taser use crossed the line and became excessive where the officer tasered a resisting suspect not once—which the plaintiff conceded would have been justified—but up to a dozen times over two minutes." *Smith*, 834 F.3d at 1294 (discussing *Oliver*, 586 F.3d at 905-07). In this case, the facts viewed in the light most favorable to Charles show that she was only tased once for a period of approximately four seconds. Docs. 60-6 ¶ 7; 62 ¶ 7; Scuderi Dashcam 18:32:31-18:32:34. The fifth factor also favors Scuderi.

"The nature and extent of physical injuries sustained by a plaintiff are relevant in determining whether the amount and type of force used by the arresting officer were excessive." *Stephens*, 852 F.3d at 1325 (citations and italics omitted). Charles allegedly suffered "back pain and cuts to the bottom of her feet from the broken window glass." Doc. 57-1 ¶ 16. There is no evidence that those injuries were caused by Scuderi's taser use. Charles also claims "excessive force" caused "the death of my unborn child." Doc. 62 ¶ 7. But the record does not support that assertion either. Charles's medical records show that she refused medical treatment on the date of the incident, including an ultrasound, and she was released into police custody only hours

after the use of force incident occurred.  Doc. 57-3 at 15-24.  Not until two months later did Charles find out her pregnancy was non-viable, and while tragic, there is simply nothing in the record to link Charles's failed pregnancy to Scuderi's taser use, or anything else that occurred on November 7, 2020.[10]  *See id.* at 25-36.  This final factor also favors Scuderi.

In summary, the grabs, pushes, and pulls that Greene and Scuderi used to remove Charles from her vehicle were a mere application of de minimis force that cannot support an excessive force claim.[11]  And while Scuderi's alleged brief taser use falls outside the realm of de minimis force, it was objectively reasonable under the circumstances.  Because neither Greene nor Scuderi violated Charles's constitutional rights when they removed her from her vehicle, both Greene and Scuderi are entitled to qualified immunity with regard to Charles's excessive force claim.

## B. Greene and Scuderi are Entitled to Official Immunity

Greene and Scuderi argue they are entitled to official immunity on Charles's state law claims for assault, battery, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress.  Doc. 57-2 at 17-18.  Official immunity "applies to an officer's 'discretionary actions taken within the scope of his official authority.'"  *Gates v. Khokhar*, 884 F.3d 1290, 1304 (11th Cir. 2018) (quoting *Cameron v. Lang*, 274 Ga. 122, 123, 549 S.E.2d 341, 344 (2001)).  Under Georgia's constitution,

---

[10] Charles produced medical records of her own, which show a positive pregnancy test on December 7, 2020 and a lumbar spine MRI taken on February 23, 2022.  Doc. 60-10.  Even if the Court were to consider these records—none are certified by the medical treatment provider—the records don't help Charles because Charles has submitted no evidence to link her failed pregnancy, or subsequent lumbar spine issues to Scuderi's taser use.

[11] Even if the Court applied the multifactor analysis to Greene and Scuderi's grabs pushes, and pulls, the result would be the same—the grabs, pushes, and pulls employed by Greene and Scuderi to remove Charles from her vehicle were objectively reasonable under the circumstances.  *See Wade*, 36 F.4th at 1325.

official immunity "protects an officer from personal liability arising from his performance of 'official functions' as long as the officer did not act with 'actual malice' or 'actual intent to cause injury.'" *Id.* (quoting Ga. Const. art. I, § 2, para. IX(d)). "The Georgia Supreme Court has defined actual malice in this context to mean a 'deliberate intention to do wrong.'" *Id.* (citing *Adams v. Hazelwood*, 271 Ga. 414, 414-15, 520 S.E.2d 896, 898 (1999)). "Likewise, the phrase 'actual intent to cause injury'—as used in Georgia's official immunity provision—means 'an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury.'" *Id.* (quoting *West v. Davis*, 767 F.3d 1063, 1073 (11th Cir. 2014)).

It is undisputed that Greene and Scuderi were performing a discretionary action within the scope of their official authority. And there is no evidence that Greene and Scuderi acted with actual malice or intended to cause injury as defined by Georgia law. Accordingly, Greene and Scuderi are entitled to summary judgment with regard to Charles's state law claims.

## C. Charles's Supervisory Liability and Failure to Train Claims Fail

It is well established that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1047 (11th Cir. 2014) (internal quotation marks and citations omitted). "Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Id.* at 1047-48. "The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on

notice of the need to correct the alleged deprivation, and he fails to do so.  Alternatively, the causal connection may be established when a supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."  *Id*. at 1048 (cleaned up).

Similarly, to succeed on a § 1983 failure to train claim, a supervising official is only liable when "his failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact and the failure has actually caused the injury of which the plaintiff complains."  *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1397 (11th Cir. 1994) (internal quotation marks and citations omitted).  In a failure to train case, a plaintiff "must demonstrate that the supervisor had 'actual or constructive notice that a particular omission in their training program causes [his or her] employees to violate citizens' constitutional rights,' and that armed with that knowledge the supervisor chose to retain that training program."  *Keith*, 749 F.3d at 1052 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  "To establish that supervisor was on actual or constructive notice of the deficiency of training, '[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary.'"  *Id*. at 1053 (quoting *Connick*, 563 U.S. at 62).

Charles alleges in her amended complaint that the City of Warner Robins and Wagner, the Chief of the WRPD, are liable because "the policies, procedures, practices, training or customs" of the City and Wagner caused Greene and Scuderi to violate her constitutional rights.  Doc. 29 ¶¶ 67-69.  In the alternative, Charles alleges the City and Wagner "had no policy, procedure, practice or custom in place" that prevented Greene

and Scuderi from violating Charles's constitutional rights.  *Id.* ¶¶ 70-71.  Or in the

alternative to the alternative, Charles contends the City and Wagner are liable because

they supervised and/or trained Greene and Scuderi when they violated Charles's

constitutional rights.  *Id.* ¶¶ 72-75.

But because Greene and Scuderi did not violate Charles's constitutional rights

her claims against the City and Wagner must fail.  *Beshers v. Harrison*, 495 F.3d 1260,

1264 n.7 (11th Cir. 2007) (collecting cases); *Rooney v. Watson*, 101 F.3d 1378, 1381

(11th Cir. 1996) ("Since we have determined that [the Deputy's] conduct did not cause

the [plaintiffs] to suffer a constitutional deprivation, we need not inquire into Volusia

County's policy and custom relating to patrol vehicle operation and training.").

And even if Greene and Scuderi had violated Charles's constitutional rights,

Charles offers no admissible evidence to support her supervisory liability and failure to

train claims other than WRPD's taser policy.  For example, she submits no evidence

that the City and Wagner failed to investigate claims of excessive force, or that Greene

and Scuderi were deficiently trained.[12]  As for the taser policy, General Order 2007-01

of the WRPD, which both Charles and the defendants attached to their briefs, permits

the use of a taser to "drive stun a subject" to gain compliance of an "actively resistant"

subject.  Doc. 57-4 at 3, 6.  In turn, General Order 2007-01 provides a non-exhaustive

definition of "active resistance," including a subject "bracing against an object …

refusing to release a steering wheel to avoid being removed from a vehicle, [and]

keeping an officer from being able to handcuff the subject by preventing the officer

access to [her] hands."  *Id.* at 2.  Nothing about that policy is unconstitutional—the

---

[12] Nor can it be said that the City and Wagner turned a blind eye to Greene and Scuderi's allegedly unconstitutional conduct—an internal review by the WRPD concluded that the amount of force used "was reasonable and within the policies and procedures" set forth in General Order 2007-01.  Doc. 57-1 ¶ 18.

Eleventh Circuit has made clear that "[t]he use of a taser is not categorically unconstitutional [and] can be appropriate in a wide array of situations." *Charles*, F.4th 686 at 701. In short, Charles's various theories of liability against the City and Wagner fail.[13]

## IV. CONCLUSION

Because Greene and Scuderi did not violate Charles's Fourth Amendment rights, they are entitled to qualified immunity. Greene and Scuderi are also entitled to official immunity on Charles's state law claims because there is no evidence that they acted with actual malice or an actual intent to cause injury to Charles. Finally, because Charles has produced no evidence to support her supervisory liability and failure to train claims against the City and Wagner, those claims fail too.[14] Accordingly, the defendants' motion for summary judgment (Doc. 57) is **GRANTED**.[15]

---

[13] Charles filed three videos, which Charles claims were provided "by plaintiff [sic] former attorneys." Docs. 60-7; 62 ¶ 11. According to Charles, those videos show "a black male placed in a chokehold by defendant … a black female arrested for making a statement in her own home [and] … [a] black male walking down the street stopped and arrested along with his cousin." Doc. 60-7. Even if the Court could consider the videos—they are unauthenticated and, according to the defendants, they were never served on the defendants until Charles responded to their second motion for summary judgment—the Court cannot tell how those videos, viewed in a vacuum, are relevant. Charles offers no evidence of the circumstances surrounding the events depicted in the videos and the videos themselves do not support any inference of improper conduct.

[14] Charles also raises official capacity claims against Greene, Scuderi, and Wagner. Doc. 29 ¶¶ 8, 12, 20. When a police officer is sued under 42 U.S.C. § 1983 in his official capacity, the suit is just "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir.1991). Due to this, the claims against Defendants Greene, Scuderi and Wagner in their official capacities are dismissed as redundant because Charles has also named the City of Warner Robins in this action. *Id.* (stating that keeping both the City and officers sued in their official capacities was redundant); *Manning v. City of Atlanta*, 2007 WL 1630715 at *3-4 (N.D. Ga. June 1, 2007) (finding that plaintiff's claims against city police officers "effectively merge" with his claims against the city because "[w]hen a city officer is sued under § 1983 in his or her official capacity, the suit is simply 'another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Kentucky v. Graham*, 473 U.S. at 165).

[15] Charles also moved for leave to file a surreply. Doc. 67. Surreply briefs are disfavored under the local rules, especially so when the plaintiff's response exceeds the twenty-page limitation in violation of Local Rule 7.4 as Charles's thirty-eight-page response does here. M.D. Ga. L.R. 7.3.1(B) & L.R. 7.4.

**SO ORDERED**, this 10th day of April, 2023.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

Moreover, any surreply is simply futile.  Accordingly, Charles's motion for leave to file a surreply (Doc. 67) is **DENIED**.